Universal Mills v. Commissioner.
Universal Mills v. Commissioner
Docket No. 16663.
United States Tax Court
1948 Tax Ct. Memo LEXIS 26; 7 T.C.M. (CCH) 886; T.C.M. (RIA) 48251; November 26, 1948
*26 G. W. Parker, Esq., and A. E. Brooks, Esq., Fort Worth Nat'l Bank Bldg., Fort Worth, Tex., for the petitioner. J. Marvin Kelley, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner challenges respondent's determination of deficiencies for the taxable year ending May 31, 1944, as follows: Income Tax
$ 830.60
Declared Value Excess-Profits
Tax
1,523.02
Excess-Profits Tax
22,139.35
The above deficiencies resulted from respondent's action in disallowing deductions of $12,500, representing the cost of repairing, painting, and waterproofing grain elevators, and $3,536.86, representing the cost of replacing electric wiring; and in disallowing $4,094.57, representing depreciation on automobiles and trucks. Findings of Fact Petitioner, a corporation, filed its income and declared value excess-profits tax, and excess-profits tax returns for the fiscal year ending May 31, 1944, with the collector of internal revenue for the second district of Texas. Petitioner is engaged in the flour and feed milling business in Fort Worth, Texas. All properties of petitioner involved in this proceeding *27 are situated in Fort Worth. The present flour mill and one battery of concrete grain storage tanks or elevators having a capacity of about 200,000 bushels were constructed in 1930. A second battery of concrete tanks was constructed in 1932 and 1933, sometimes hereinafter called the "middle battery." A third battery of concrete tanks was constructed in 1936. The first battery of tanks, constucted in 1930, was painted approximately upon construction with a type of paint having waterproofing qualities and in common use among companies which use concrete structures. The first battery was again painted with the same type of paint in 1933 after construction of the middle battery, and in 1936 after construction of the third battery. In 1933 and 1936, both the middle and third batteries were also painted, it being petitioner's practice to paint all its tanks, including those just built, upon construction of an additional battery. Early in 1939 it was observed that in the middle and third batteries there had begun a seepage of moisture through tank walls as a result of cracks which had developed in the concrete. In an effort to remedy these defects, petitioner made arrangements to chink *28 the cracks and repaint the tanks. Neither at or before that time were the tanks sand-blasted or the cracks cut or cleaned out. An asphalt or tar substance was forced into the cracks by hand, following which all three batteries of tanks were repainted. During the summer of 1943 it was observed that moisture again began to seep through cracks into the middle and third batteries of tanks. The asphalt or tar substance, which had been used to fill the cracks in 1939, had come through the paint, causing the paint to smear. There were also some cracks in the original battery built in 1930, but petitioner did not think that battery was absorbing sufficient moisture to necessitate work at that time. In the fall of 1943 a contract was entered into between petitioner and John D. Bolton & Company, Chicago, Illinois, hereinafter called Bolton, which provided in part: "As requested by you we are pleased to submit herewith out proposal in duplicate for repairing and waterproofing certain surfaces of your Grain Tanks, as outlined below. We carefully examined these tanks and took measurements to determine the area. "SCOPE OF WORK: The work involved includes the repair and waterproofing of all *29 exterior surfaces of the center battery of tanks, together with the exterior surfaces of the sides of the conveyor or Texas house. Our proposition is based on the assumption that the banks are 90 feet high and the Texas house 8 feet high. The Texas walls to be treated are over the tanks mentioned above and are to be treated from expansion joint to expansion joint. "The price also includes five of the center tanks of the West Battery, but does not include the Texas walls. We are giving you an additional price in case you decide to repair and waterproof the entire West Battery. "We most assuredly recommend the repair of the entire West Battery of tanks, because all of them are badly cracked, and if they do not leak now, they will in the near future if not repaired and waterproofed. "SPECIFICATIONS: The entire surface shall first be sand-blasted to remove the present layers of paint and waterproofing, as well as all tar or asphalt over the cracks. The original concrete will thus be exposed. "All loose, porous or disintegrated concrete shall then be removed by air or hand tools. Where necessary the cracks shall be cut out. 'Gunite' as applied by compressed air with a 'Cement Gun' *30 shall then be placed to fill all cut-out places to the original contours of the tanks. Embecco as manufactured by the Master Builders Company of Cleveland, Ohio, shall be added in proper proportions to the 'Gunite' to overcome shrinkage. "After all repairs are completed the entire surface shall receive an application of 'Rain-Shed' Prime Coat to prepare it for the final applications which are to follow. The Prime Coat is to be applied by compressed air. After the Prime Coat has been applied, all cracks are to receive a covering of 'Rain-Shed' Plastic, so as to give these vulnerable points added depth of material and greater elasticity. "The Main body of 'Rainshed' shall then be applied by compressed air to a depth so that 32 square feet of surface is covered with each gallon of material used. "Inasmuch as you desire a final finish of pure white, the main body coat will have white pigment added which will make it an Oyster Grey. It is impossible to make this main body coat pure white without taking from it some of its necessary qualifications. In order to further whiten it to a dead white after the main body coat has set for from ten days to two weeks, we will give the entire *31 surface an extra coat of high class white paint. (The oyster gray Rain-Shed is higher in price than the regular Rainshed and the final coat of white paint is an added cost). "GUARANTEE: We will guarantee our work against workmanship and material and should anything develop to dissatisfy you for a period of five years we will correct it without cost to you upon notification. "We would like very much to do this work for you this winter, not only to keep our regular men busy, (you would have all experienced men on the job and more than usually put on this size contract), but also so that we can have a sample of our work in this territory for examination by other possible customers. "It will take at least three weeks to get the material delivered and it will require an M.R.O. AA-1 Preference rating which we presume you have." Pursuant to the terms of the above contract, late in 1943 and extending to the early part of 1944, Bolton took the old paint off the middle and third batteries. The tar where the cracks were opened was then chipped out with an air hammer. Where the concrete around the cracks was not deteriorated, the cracks were chipped out to a depth of about one-half inch, *32 and filled with caulking compound. In many instances the concrete around the cracks was deteriorated, some holes extending entirely through tank walls. Where the concrete was deteriorated, Bolton chipped to greater depths, in some instances chipping entirely through the tank walls. Those larger cracks or holes were then filled with "gunite," a mixture of sand and cement mixed dry and sprayed through a gun with water being applied at the nozzle. Following the use of caulking compound and "gunite," the middle and third batteries were sandblasted to remove loose dirt and tar in order to make the waterproofing adhere to the tanks. Next, a primer coat of paint was sprayed on the middle and third batteries, followed by an application of "rainshed waterproofing" which is an asbestos base of caulking compound so diluted that it can be sprayed through a gun. Finally, the entire surface of all three batteries of tanks was painted with a waterproof type paint. The complete process described above was applied to the middle and third batteries of tanks, built in 1933 and 1936, but the only work done by Bolton at that time on the oldest battery, built in 1930, was the coat of a waterproof type paint. *33 The total sum expended by petitioner during the taxable year under its contract with Bolton was $12,500. In its returns, petitioner claimed this amount of $12,500 as a deduction for ordinary and necessary business expense. Respondent has disallowed the deduction, on grounds that the $12,500 was a capital expenditure. Of the $12,500, one-half was expended for repairing the cracks and painting, and the other half for waterproofing. If the work by Bolton described above, or similar work, had not been done on the middle and third batteries of tanks, petitioner would have found it necessary to abandon them for the purpose of storing grain. At the time of the hearing in this proceeding, in 1948, the waterproofing surface applied as above described in 1943 and 1944 by Bolton was again beginning to peel off the tank walls. Prior to the year 1942, petitioner did not operate at peak capacity although it ran three shifts. It would operate anywhere from three to five days per week. Beginning in 1942, and continuing throughout 1943 and 1944, petitioner increased the operation of its plant to excess of capacity and operated on a 24-hour basis and usually seven days per week. This increased operation *34 put an extreme load on petitioner's electric wiring system, which had been in the mill since its construction in 1930. Petitioner procured its electric power from the Texas Electric Service Company, which furnished power to the mill by a feed-in wire to a bank of transformers owned and maintained by the Texas Electric Service Company. Petitioner owned all wiring through which electricity passed after leaving the transformers. In the taxable year petitioner entered into a contract with the Wortham Electric Company, hereinafter called Wortham, under which Wortham agreed to do certain electric work in petitioner's mill, including the furnishing and installation of some new electric equipment and the replacement of some old electric equipment. Pursuant to the terms of the above-mentioned contract, Wortham relocated the old electric switches in a new switch house. The cost of building the new switch house was capitalized by petitioner and is not in controversy here. With the exception of some 80 feet running from the switch installation to the flour mill basement, all old electric lines from the switch house to the other portions of the mill were abandoned. New wiring was furnished and *35 installed by Wortham from the switch house to the various outlets in the mill. The work by Wortham above described extended over two or three years following the taxable year. During the taxable year the sum of $3,536.86 was expended by petitioner under the contract with Wortham. In its returns petitioner claimed this amount as a deduction for ordinary and necessary business expense. Respondent has disallowed the deduction on grounds that the $3,536.86 was a capital expenditure. Petitioner owned during the taxable year approximately 40 pieces of automotive equipment, consisting of trucks and automobiles. It has been the custom of petitioner for many years to depreciate its automotive equipment over a four-year period, making no allowance for salvage value. Following that custom, in its returns for the taxable year petitioner claimed depreciation on automotive equipment in the amount of $11,553.66. A schedule attached to its returns disclosed an individual account for each item of automotive equipment, giving information in part as follows: Cost at
Life
Depr. Reserve
Depr. Sustained
Name
Year
Acquisition
Years
at 5/31/43
in Taxable Year
Indiana Truck
1939
$1,369.05
4
$1,256.84
$112.21
Ford Pick-up
1939
782.00
4
717.90
64.10
White Truck
1940
2,505.95
4
1,686.30
421.56
Hobbs Trailer
1940
1,178.47
4
834.74
294.61
G.M.C. Truck
1941
2,516.00
4
1,079.93
629.00
Ford Truck
1941
1,095.00
4
593.12
273.75
Hyde Trailer
1941
1,152.00
4
621.20
288.00
G.M.C. Truck
1941
1,830.00
4
991.26
457.50
Hyde Trailer
1941
1,085.00
4
587.70
271.25
Chevrolet Truck
1941
1,118.50
4
559.25
279.63
Chevrolet Truck
1941
1,073.50
4
536.75
268.38
Hyde Trailer
1941
1,121.00
4
556.65
280.25
Ford Truck
1941
1,154.75
4
570.25
288.69
Hyde Trailer
1941
1,121.00
4
552.05
280.25
Ford Truck
1942
1,549.25
4
585.71
387.31
Ford Truck
1942
1,549.25
4
584.65
387.31
Chevrolet Truck
1942
1,726.70
4
649.26
431.68
Ford Truck
Used
300.00
3
200.00
100.00
Hyde Trailer
1944
1,638.86
4
53.48
Hudson Tudor
1941
1,400.00
4
831.22
350.00
Hudson Tudor
1941
875.00
4
510.42
218.75
Hudson Tudor
1941
1,225.00
4
701.82
306.25
Plymouth Tudor
1941
922.50
4
490.06
230.63
Plymouth Tudor
1941
945.00
4
452.73
236.25
Ford Tudor
1942
910.00
4
351.47
227.50
Plymouth Tudor
1942
1,076.25
4
415.74
269.06
Plymouth Tudor
1942
1,102.00
4
404.55
275.50
Hudson Tudor
1942
1,308.54
4
334.39
327.14
Oldsmobile Tudor
1941
791.50
4
189.63
197.88
Plymouth Tudor
1942
1,077.45
4
202.05
269.36
Chevrolet Coupe
1942
1,081.20
4
191.42
270.30
Plymouth Tudor
1942
1,079.19
4
168.60
269.80
Chevrolet Sedan
1942
1,199.76
4
87.50
299.94
Plymouth Tudor
1942
1,127.67
4
70.47
281.92
Plymouth Tudor
1942
1,150.36
4
59.93
287.59
Chevrolet Sedan
1942
1,140.18
4
41.56
285.04
Plymouth Tudor
1942
1,147.29
4
39.82
286.82
Ford Tudor
1942
1,223.22
4
38.22
305.80
Chevrolet Sedan
1942
1,242.70
4
32.36
310.68
Oldsmobile Sedan
1941
1,913.95
4
478.49
Totals
$18,777.52
$11,553.66
*36 Respondent has disallowed $4,094.57 of the depreciation so claimed, allowing the entire amount claimed on the Ford truck referred to as "used." The 1939 Indiana truck was abandoned in 1944 or 1945, and at the time of the hearing was sitting at petitioner's mill and would not run. The 1939 Ford pick-up was disposed off prior to the hearing. Of the expenditure of $12,500 for work on the storage tanks, the amount of $6,250, representing the cost of repairing cracks in and painting petitioner's elevators is properly deductible as an ordinary and necessary expense; and the amount of $6,250, representing the cost of waterproofing petitioner's elevators, is not properly deductible as an ordinary and necessary expense, but was an expenditure for a capital improvement with an anticipated useful life of five years. The amount of $3,536.86, representing the cost of new electric equipment in petitioner's plant is not properly deductible as an ordinary and necessary expense, but was a capital expenditure. As of the close of the taxable year, the anticipated useful life of all of petitioner's automotive equipment was four years from the date of acquisition, except for the first two items *37 listed above, the 1939 Indiana truck and the 1939 Ford pick-up, the latter, as to which $132.23 of the deduction has been disallowed, having anticipated lives or salvage value at the close of the taxable year of an indeterminate amount, not less than that determined by respondent. Opinion Deductibility of the item claimed for work done on petitioner's grain storage tanks turns on the familiar issue of whether it is a repair chargeable as ordinary and necessary expense against current income, or is in the nature of an addition or improvement which must be capitalized. The distinction phrased in the frequently-quoted language of , is: "* * * In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. *38 It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings." * * * That the cutting out and filling of cracks and repainting were nothing more than repairs seems clear from the nature of the circumstances. When that work was finished, petitioner's property was no better than it had been when first constructed and was merely mended or restored to a sound state adequate for ordinarily efficient operation, with neither added value nor appreciably prolonged life. We cannot, however, reach a similar conclusion as to the waterproofing. Not only was this a process employed for the first time and after the structures had been in existence for many years, but for all that appears, it definitely improved the property itself and left the petitioner with something it had not *39 had before. The size and nature of the expenditure would indicate that a real improvement was contemplated and in fact acquired, and there is no evidence in the record that even after five years the cracks and breaks in the buildings' walls had reappeared. This part of the operation, consequently, seems to us to partake of the nature of a capital improvement requiring capitalization. See . Such a result necessitates an allocation of the total expenditure between the repair and painting of the walls on the one hand and the waterproofing on the other. See . While the evidence on this subject leaves something to be desired, we construe testimony of the witness who supervised the job as amounting to a statement that the cost should be divided evenly between the two parts of the work. In addition, it can be gathered from the record that the anticipated life of the waterproofing was five years, entitling petitioner to deduct one-fifth of the amount in each year. It follows that the amount deductible in the instant year is one-half of the contract price of $12,500, together with 20 percent *40 of the balance. Disposition of the second issue involves an application of the same principle. In this instance, however, the conclusion seems inescapable that substantially all of the wiring installed was an addition or improvement rather than a repair. Practically all (except for about 80 feet) was new wiring and constituted a substitution or replacement. This deduction was in our view properly disallowed. ; First National Bank in . The final issue relates to a deduction for depreciation of automotive equipment. It seems to be conceded that petitioner's long-continued practice, acquiesced in by respondent, was to permit full depreciation of each item of equipment on the basis of a four-year life. Respondent's partial disallowance of the deduction appears to be based upon the existence of war-time conditions requiring the use of the equipment for longer periods than customary. Although there is some reference - not in the deficiency notice nor at the hearing but in respondent's brief when it was too late for petitioner to meet the issue - to the element of salvage value, we take it that the *41 tacitly accepted corollary of petitioner's depreciation practice is that its account was maintained on the theory that its equipment is operated until fully depreciated or used up. [1] This being so, no element of salvage can be involved in the depreciation accounting, and the fact, if it be such, that a partly used automobile might be worth more under war-time conditions could have no bearing upon the present result. Cf. . The assumption upon which respondent's position is founded is that the difficulty of procuring replacements lengthened the duration of petitioner's use of the property and resulted in its having a useful life longer than would ordinarily be the case. [2] The evidence would tend to negative this assumption, in view of the testimony in another connection that petitioner's plants worked in excess *42 of capacity during the war. It would be reasonable to infer from this that its automobiles and trucks were given harder usage at this time, and hence would presumably wear out sooner. Be that as it may, while it cannot be doubted that a reexamination of the situation may be made by either party from time to time, , it is not permissible to require readjustment retroactively upon the basis of hindsight resulting from subsequent developments, and the estimate as to anticipated useful life at any time is to be made in the light of "conditions known to exist at the end of the" current period. Regulations 111, section 29.23(1)-5. *43 With the exception of two pieces of equipment, which will be further referred to, none had in the instant year reached the end of their originally anticipated life. Petitioner's records show that with two other insignificant exceptions petitioner's use of its automotive equipment had, up to the end of the period in issue, been well below four years, and divided evenly between about two and about three years. War conditions could not continue indefinitely, and we think petitioner was not required to assume in 1944 that they would extend for three or four years thereafter, as respondent does. On the basis of the facts as they were known to exist at the end of the instant tax year, we conclude that petitioner was justified in adhering to its customary method of depreciation, and that the estimate of useful life theretofore adopted was not so patently inaccurate as to require revision, at that time. This disposition applies to all the items except the two which apparently became fully depreciated in the current year, but nevertheless appear to have been either useful or disposable at that time. One was not abandoned until a subsequent year, and the other was disposed of under undisclosed *44 circumstances. As to the depreciation on these two items, totaling $176.31, petitioner has not overcome the presumption of correctness of respondent's action, and the deficiency was proper. Disallowance of the remainder, we consider erroneous. Decision will be entered under Rule 50. Footnotes
1. "Q. I believe you testified with respect to depreciation on the automotive equipment that it had been the custom for many years to depreciate this equipment on a basis of four year life? "A. That is correct. "Q. That is, you depreciated the full cost allowing for no salvage value whatever? "A. That is correct."↩
2. Respondent's counsel said in his opening statement: "* * * due to the fact that equipment was scarce and they were unable to replace it, they continued to use it and due to that fact, the Commissioner has extended the life of this equipment in keeping with the actual conditions and actual operation of this equipment and we believe that the position of the Commissioner in so depreciating this property as he has done is fair and reasonable and in keeping with the conditions existing during the war period. * * *
"The Court: Now, the remaining value, however you want to describe it, that was left in these automobiles and trucks at the end of this year, that wasn't recovered in cash or anything like that? "[Respondent's Counsel]: No, the remaining value at the end of the taxable year involved was depreciated over a remaining life of four years. Now - "The Court: That regardless of how old the cars and trucks were at that time? "[Respondent's Counsel]: That is correct. * * *
"* * * it might not be possible to know that fact, but experience since that time has proved that it was correct."↩